UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-50112
_____

ADRIAN CAVALLINI, ET AL.,

Plaintiffs-Appellants,

versus

STATE FARM MUTUAL AUTO INSURANCE CO., ET AL.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

(January 26, 1995)

Before WHITE, Associate Justice (Ret.);[1] BARKSDALE, and PARKER,
Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The appeal in this removed diversity action concerns
fraudulent joinder and enforcement of a settlement agreement, with
the critical issue being whether, in order to defeat removal based
on fraudulent joinder, the state court complaint in issue here can
be expanded by post-removal affidavits or amendment to state a
cause of action against the nondiverse defendant. If removal
stands, we must determine whether correspondence between the
parties constitutes an enforceable settlement under Texas Rule of
Civil Procedure 11 (settlement of action not enforceable unless "in

_____

[1]    The Honorable Byron R. White, Associate Justice of the United
States Supreme Court, (Ret.), sitting by designation, pursuant to
28 U.S.C. § 294(a).

writing, signed and filed ... [in] the record, or ... made in open court and entered of record").

The Cavallinis challenge the dismissal with prejudice of Larry Cunningham (the nondiverse defendant), an agent for State Farm Mutual Automobile Insurance Company, contending that he was not fraudulently joined; and the summary judgment for State Farm, contending that the action had not been settled. We **AFFIRM**.

I.

Adrian Cavallini purchased a hospitalization insurance policy from State Farm, through Cunningham, in July 1990; his wife, Debra Cavallini, was insured through her employer, The Olsten Corporation. On August 21, 1991, their son was born with serious birth defects.[2] He was added as an insured under the State Farm policy, but State Farm took the position that the Olsten policy provided primary coverage for the son's medical expenses. In November 1991, State Farm gave notice that its policy would be cancelled effective January 1992.

On January 29, 1992, the Cavallinis (Texas citizens) filed suit in Texas state court against State Farm (an Illinois corporation) and Cunningham (a Texas citizen), asserting claims for breaches of contract and of the duty of good faith and fair dealing. State Farm and Cunningham removed the action to federal court on March 2, claiming that Cunningham's joinder was

---

[2]    The Cavallinis' son was born with tetra-phocomelia (absence of arms and legs) and a diaphragmatic hernia; was hospitalized 20 days to repair the hernia; and will require continuous attachment, detachment, and modification of prosthetic devices for his missing limbs.

fraudulent. That same day, they filed a third-party complaint against Olsten's health benefit plan, seeking contribution and/or indemnity.[3]

On March 30, the Cavallinis moved to remand.[4] And, five and one-half months later, in mid-September 1992, they moved for leave to amend their complaint, "to clarify those facts which support a cause of action against" Cunningham, but did not attach the proposed amendment.[5] On October 1, noting that the parties had announced that they were in the process of finalizing settlement, the district court denied all pending motions, to include that for remand, subject to renewal absent settlement.

---

[3] The third-party complaint and notice of removal claimed federal question jurisdiction over the third-party claim, and asserted that it was separate and independent, and therefore removable pursuant to 28 U.S.C. § 1441(c). On January 11, 1994, approximately ten days before it ruled in favor of State Farm and Cunningham, the district court granted the Olsten Plan's motion for summary judgment. State Farm and Cunningham state that their appeal from that judgment is being held in abeyance pending resolution of this appeal.

[4] The Cavallinis asserted (1) that Cunningham would be a proper defendant under the Texas Deceptive Trade Practices Act (DTPA), but that the claim could not be asserted until 60 days after notice was given; and (2) that the allegation that the amount in controversy exceeded $50,000 was unsupported (they have not pursued this contention on appeal).

[5] The Cavallinis asserted that Cunningham, as State Farm's agent and representative, "committed various acts of misrepresentation and deception" and "encouraged Plaintiffs to file a groundless lawsuit against a third party and offered to falsify insurance documents in order for ... State Farm ... to escape its liability". These charges are developed more fully in their September 1993 affidavits in opposition to summary judgment, discussed *infra*.

The Cavallinis re-urged their motion to remand on October 26, stating that the parties had been unable to settle.[6]  A month later, they did the same for leave to amend, but again failed to attach the proposed amendment.  In late July 1993, the district court denied the motion to remand, stating only that it "lack[ed] merit".

A month later, State Farm and Cunningham moved for summary judgment, asserting, *inter alia*, that the case had been settled.  The Cavallinis responded that there were material fact issues concerning both the settlement, and whether State Farm breached the contract (policy) and acted in bad faith in denying benefits; in addition, they submitted affidavits regarding Cunningham.  One week after State Farm and Cunningham moved for summary judgment (and a month after denial of their re-urged remand motion), the Cavallinis filed a third motion for leave to amend, attaching the proposed amendment for the first time.[7]

The court conducted, on December 21, an evidentiary hearing on settlement.  In mid-January 1994, after the court granted summary judgment for Olsten, *see* note 3, *supra*, the Cavaillinis re-urged their motion to remand.  Shortly thereafter, the court dismissed the claims against Cunningham with prejudice, holding that he had been fraudulently joined, and granted summary judgment for State

---

[6]    As also discussed *infra*, the exchange of settlement correspondence was from mid-August to late October 1992.

[7]    The court had not ruled on their second motion for leave to amend, filed in November 1992.

Farm, holding that the parties had made an enforceable settlement agreement.

The district court denied the Cavallinis' motion for reconsideration. Among other things, they asserted that the court, in ruling on remand, should have considered their affidavits filed in opposition to summary judgment.

II.

Needless to say, the Cavallinis challenge the remand and settlement rulings.

A.

"The burden of proving a fraudulent joinder is a heavy one. The removing party must prove that there is absolutely no possibility that the plaintiff will be able to establish a cause of action against the in-state defendant in state court, or that there has been outright fraud in the plaintiff's pleading of jurisdictional facts." *Green v. Amerada Hess Corp.*, 707 F.2d 201, 205 (5th Cir. 1983), *cert. denied*, 464 U.S. 1039 (1984). Because no one disputes that the Cavallinis and Cunningham are Texas residents, "[o]ur sole concern is whether there is a possibility that [the Cavallinis] ha[ve] set forth a valid cause of action" against Cunningham. *Id.* We "evaluate all of the factual allegations in the plaintiff's state court pleadings in the light most favorable to the plaintiff, resolving all contested issues of substantive fact in favor of the plaintiff", *id.*, and "then examine relevant state law and resolve all uncertainties in favor of the nonremoving party." *Id.* at 206.

The district court held that, as of removal, the Cavallinis' state court petition (complaint) "did not allege a cause of action against ... Cunningham".[8] The Cavallinis counter that the

---

[8] In its comprehensive opinion holding that the action had been settled, the district court discussed also why it had denied remand and was dismissing Cunningham:

> State Farm removed this case on the grounds that Plaintiffs' joinder of ... Cunningham, a San Antonio based State Farm agent, was fraudulent and was done solely to defeat diversity. The Court agrees. A party that removes a case to federal court on the grounds that a non-diverse party was fraudulently joined must show that the plaintiff has no possibility of recovery against the non-diverse party. In removal cases, jurisdiction is determined by examining the plaintiff's complaint at the time of removal.
>
> At the time this case was removed, Plaintiffs' state court petition did not allege a cause of action against ... Cunningham. The petition alleges causes of action for breach of contract and breach of the duty of good faith and fair dealing. Assuming that Cunningham could be liable to Plaintiffs under either of these theories, the petition simply does not allege any facts against ... Cunningham. Other than listing his name and address for purposes of service, the petition does not specifically mention ... Cunningham at all. The petition does contain a prayer for exemplary damages for "the gross misrepresentations made by the Defendants." Absent any factual allegations however, the prayer standing alone cannot support a cause of action against Cunningham. Even if Plaintiffs' amended petition, for which the Court has not yet granted leave to file, does state a cause of action against Cunningham, it is well established that an amended petition cannot operate to defeat jurisdiction of a case that was properly removed.
>
> The Court denied Plaintiffs' motion re-urging their motion to remand on July 23, 1993. That order did not elaborate on the basis for the decision nor did it dismiss ... Cunningham from the lawsuit. Hopefully, the discussion here clarifies the jurisdiction issue. The Court will formally

- 6 -

complaint states a claim against Cunningham for breach of the duty of good faith and fair dealing; that, together with their affidavits, it states a claim against Cunningham for misrepresentation under the DTPA; and, that their motion to amend should have been granted, and the amended complaint considered in ruling on the fraudulent joinder/remand issue.[9]

1.

dismiss ... Cunningham from the lawsuit in this order.

(Citations omitted.)

[9]     In their opening brief, the Cavallinis did not raise whether the complaint states a claim against Cunningham for breach of contract.  Their reply brief contains only the bald assertions that "Larry Cunningham is liable for breach of contract", and that their affidavits establish his possible liability for breach of contract. Needless to say, we do not consider issues raised for the first time in a reply brief.  *See Stephens v. C.I.T. Group/Equipment Financing, Inc.*, 955 F.2d 1023, 1026 (5th Cir. 1992).  Moreover, the failure to provide any legal or factual analysis of an issue results in waiver of that issue.  *See United States v. Green*, 964 F.2d 365, 371 (5th Cir. 1992), *cert. denied*, ___ U.S. ___, 113 S. Ct. 984 (1993); Fed. R. App. P. 28(a)(6).

In addition, the Cavallinis contend, again for the first time in their reply brief, that their affidavits establish Cunningham's possible liability under two additional theories:  violation of the Texas Insurance Code and common law fraud.  Also for the first time in that brief, they contend, without citation to authority, that they are third-party beneficiaries of the contract between State Farm and Cunningham, that Cunningham breached that contract, and that this breach somehow supports a claim by them against Cunningham for a breach of the duty of good faith and fair dealing. Because the Cavallinis raised these new issues in their reply brief, State Farm and Cunningham requested and received permission to file a supplemental brief.  That we allowed them to do so does not alter our rule of not considering issues raised in a reply brief.   Furthermore, we have serious doubts about whether the common law fraud and third-party beneficiary issues were raised in district court.

- 7 -

We agree with the district court that the complaint does not contain allegations which could support a claim under Texas law against Cunningham. He is named as a defendant in the caption and introductory paragraph, and listed as such in paragraph I, which provides addresses for service of process. Paragraph II claims, without supporting allegations, a "failure of the Defendants" to exercise a duty of good faith.

Paragraph III states claims for breaches of contract and of the duty of good faith and fair dealing, but makes no mention of Cunningham. As to the breach of contract claim, it alleges only that "Defendant State Farm ... has failed to perform a proper investigation and has attempted to mislead Plaintiffs into rescinding their claim or in the alternative to accept an inadequate amount for the claims submitted and by failing to renew the policy". And, in claiming a "breach of the duty of good faith and fair dealing owed by an *insurer* to its insured", it alleges only that "Defendant State Farm ... breached this duty for the reason there was and is no reasonable basis for denying Plaintiffs' claims and by failing to renew the policy". (Emphasis added.)

Paragraph V seeks damages, again without mentioning Cunningham, for physical pain, mental anguish, loss of income, and attorney's fees, but only "as a result of the failure of the Defendants State Farm Insurance Companies and State Farm Mutual Automobile Insurance Company" to pay policy benefits; VI seeks *exemplary* damages "[b]ecause of the gross misrepresentations made by the Defendants, and their respective failure to deal in good

faith"; and the concluding paragraph prays for judgment against the "Defendants, jointly and severally".[10]

No more need be said. As reflected above, the complaint fails to state a claim against Cunningham.

2.

Alternatively, even if the complaint could be construed as stating a claim against Cunningham for breach of the duty of good faith and fair dealing, there is no possibility that the Cavallinis could recover against him on that basis.[11] The Cavallinis rely on *Taylor v. Bonilla*, 801 S.W.2d 553 (Tex. App.--Austin 1990, writ denied), and *GAB Business Services, Inc. v. Moore*, 829 S.W.2d 345 (Tex. App.--Texarkana 1992, no writ).[12] In *Taylor*, damages were

---

[10] The Cavallinis' reliance on *Jones v. Louisiana Bd. of Trustees for State Colleges & Universities*, 764 F.2d 1183, 1185 (5th Cir. 1985), is misplaced. *Jones* did not concern removal and remand; instead, whether the plaintiffs had named a state official as a defendant in order to avoid dismissal on Eleventh Amendment grounds. Although the official was identified in the caption, and referred to throughout the body of the complaint, the defendants contended that he was not a party because he was not listed in the paragraph specifying the defendants. *Id*. at 1184-85 & n.1. Applying the rule that a complaint will not be dismissed for technical pleading defects, our court held that the complaint was sufficient to confer party status on the official, and stated that the plaintiffs could seek to amend to cure any ambiguity. *Id*. at 1185, 1186.

[11] As quoted above, the paragraph in the complaint presenting the good faith and fair dealing claim contains allegations only as to State Farm. Moreover, as emphasized, the paragraph speaks only of the duty "owed by an insurer to its insured".

[12] The Cavallinis also cite *Union Bankers Ins. Co. v. Shelton*, ___ S.W.2d ___, 1994 WL 278131, *concurring op. withdrawn & superseded by* 1994 WL 657867 (Tex. 1994), and *Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96 (Tex. 1994). Those cases have no bearing on whether the Cavallinis have a possibility of recovering from Cunningham for a breach of the duty of good faith and fair dealing; instead, both deal with the liability of an *insurer* for acts of its

sought from New York Life Insurance Company and its agent, Bonilla, for, *inter alia*, breaches of contract, fiduciary duty, and the duty of good faith and fair dealing. 801 S.W.2d at 555. Partial summary judgment and a directed verdict were granted on the two contract claims, and the jury returned a verdict for the defendants on the remaining claims. *Id*. Primarily at issue on appeal were the contract claims. *Id*. at 556-60. The court briefly addressed the contention that the jury verdict was against the great weight of the evidence, and affirmed because there was conflicting evidence "as to whether Bonilla acted in a manner consistent with the degree of care required of a fiduciary, [or] whether he ... breached the duty of good faith and fair dealing". *Id*. at 561.

Although the court seems to have assumed, implicitly, that Bonilla owed the insured a duty of good faith and fair dealing, it does not so hold, because the issue was not presented. Moreover, it apparently was established, or undisputed, that Bonilla was a fiduciary, and thus had a special relationship with the insured that would give rise to a duty of good faith and fair dealing. *Id*. Here, there are no allegations that Cunningham was a fiduciary, nor do the Cavallinis allege any facts (only their conclusory statement in their reply brief) to establish the existence of a special relationship that would give rise to such a duty.

*GAB* provides even less support for the Cavallinis. GAB, an insurance adjusting firm specializing in workers' compensation claims, contracted to handle all claims brought against 850 cities

agents.

self-insured through an intergovernmental risk pool.  829 S.W.2d at 347-48.  The court affirmed the jury's finding that GAB breached the duty of good faith and fair dealing.  *Id*. at 348.  It apparently viewed GAB as a workers' compensation carrier, not an insurance agent.  *See id*. ("Workers' compensation carriers have a duty to deal fairly and in good faith with injured employees.")  Moreover, unlike Cunningham, GAB had the authority to authorize payment of medical expenses and deny benefits.  *Id*.

In any event, even if **Taylor** and **GAB** could be read as implying that an insurance agent, such as Cunningham, has an independent duty to the insured of good faith and fair dealing, they would be inconsistent with the Texas Supreme Court's jurisprudence.  In **Arnold v. National County Mut. Fire Ins. Co.**, 725 S.W.2d 165 (Tex. 1987), *modified in part on other grounds*, **Murray v. San Jacinto Agency, Inc.**, 800 S.W.2d 826 (Tex. 1990), the Texas Supreme Court first held that an *insurer* owes its insured a common-law duty of good faith and fair dealing.  Such a duty "may arise as a result of a special relationship between the parties governed or created by a contract."  *Id*. at 167.  The court explained:

> In the insurance context a special relationship arises out of the parties' unequal bargaining power and the nature of insurance contracts which would allow unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims. In addition, without such a cause of action insurers can arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed. An insurance company has exclusive control over the evaluation, processing and denial of claims.

*Id*. To state a cause of action for breach of the duty of good faith and fair dealing, the plaintiff must allege "that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Id*.

Most important, in a recent case, ***Natividad v. Alexsis, Inc.***, 875 S.W.2d 695 (Tex. 1994), the Texas Supreme Court was asked to extend the duty of good faith and fair dealing "to bind entities and individuals in the insurance industry[, such as Cunningham,] that are not in contractual privity with the claimant." *Id*. at 697. It declined to do so, "[b]ecause the existence of a contract, vesting the insurer with exclusive control over the evaluation, processing, and denial of claims, that gives rise to a special relationship is a necessary element of the duty of good faith and fair dealing." *Id*. (internal quotation marks and citations omitted). The court explained that

> [t]he non-delegable duty of good faith and fair dealing is owed by an insurance carrier to its insureds due to the nature of the contract between them giving rise to a "special relationship." An insurance carrier, not its agents and contractors providing claims handling services, is liable to the insured for actions by the agents or contractors that breach the duty of good faith and fair dealing owed by the carrier to the insured.

*Id*. at 696.

The Cavallinis attempt to distinguish ***Natividad*** on the basis that it dealt with agents who had contracted with insurers to provide claims handling services. But, the Texas Supreme Court made clear that the existence of a contract, giving rise to a

- 12 -

special relationship, "is a necessary element of the duty of good faith and fair dealing." *Id*. at 697. Because there is none between the Cavallinis and Cunningham, there is no basis under Texas law for imposing upon him a duty of good faith and fair dealing, and thus no possibility that he could be found liable for breach of that duty.[13]

3.

The complaint does not contain any allegations underlying a claim of misrepresentation in violation of the DTPA. As noted, the word "misrepresentation" appears only once, in the exemplary damages paragraph; moreover, the DTPA is never mentioned, much less a violation of it. The Cavallinis contend, however, that the district court should have considered their affidavits to determine the possibility of recovery against Cunningham on that claim.

---

[13] As noted, at the time of removal, the Texas Supreme Court had not addressed specifically whether an insurance agent has a duty of good faith and fair dealing to an insured. Even assuming that *Taylor* and *GAB* can be read possibly to presume that duty, they still do not constitute an "`arguably ... reasonable basis for predicting that the state law might impose liability on the facts involved'". *See Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 816 (5th Cir.) (quoting *Bobby Jones Garden Apts. v. Suleski*, 391 F.2d 172, 177 (5th Cir. 1968)), *cert. denied*, ___ U.S. ___, 114 S. Ct. 192 (1993). Because *Natividad* had not been decided as of removal, the Cavallinis maintain that we cannot consider it; that the applicable law is that extant as of removal. We need not reach this issue; *Natividad* did not change Texas law. Indeed, the Texas Supreme Court pointed out that, "[s]ince its inception, the duty of good faith and fair dealing has only been applied to protect parties who have a special relationship based on trust or unequal bargaining power." 875 S.W.2d at 697. It noted further that "the `special relationship' exists only because the insured and the insurer are parties to a contract that is the result of unequal bargaining power, and by its nature allows unscrupulous insurers to take advantage of their insureds. Without such a contract there would be no `special relationship' and hence, no duty of good faith and fair dealing." *Id*. at 698.

"While we have frequently cautioned the district courts against pretrying a case to determine removal jurisdiction, we have also endorsed a summary judgment-like procedure for disposing of fraudulent joinder claims." *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817 (1990). As stated in *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 551 (5th Cir. 1981):

> A district court need not and should not conduct a full scale evidentiary hearing on questions of fact affecting the ultimate issues of substantive liability in a case in order to make a preliminary determination as to the existence of subject matter jurisdiction. The question of whether the plaintiff has set forth a valid claim against the in-state defendant(s) should be capable of summary determination.

Therefore, our court recently noted that "fraudulent joinder claims can be resolved by `piercing the pleadings' and considering summary judgment-type evidence such as affidavits and deposition testimony". *Ford v. Elsbury*, 32 F.3d 931, 935 (5th Cir. 1994) (citing *Carriere*, 893 F.2d at 100).[14] However, the Cavallinis did

---

[14] *Ford v. Elsbury* does not support the Cavallinis' assertion that post-removal affidavits can be used to defeat removal by presenting new causes of action. There, suit was filed in Louisiana state court against, *inter alia*, Arcadian Corporation and its plant manager, Elsbury, as the result of a reactor exploding at Arcadian's plant. 32 F.2d at 933. Removal was based on the claim that Elsbury (and another not in issue on appeal) had been fraudulently joined. *Id*. After noting the circumstances under which Louisiana law held that a corporate officer or employee could be held liable for injuries to third parties, our court stated that Elsbury's liability turned on factual issues such as whether he or others delegated with due care the responsibility of safe maintenance and operation of the reactor, and whether he was aware, or should have been aware, of a risk of harm and failed to respond to that risk in the manner in which a reasonably prudent plant

not cite, nor have we found, any case in which such evidence has been considered to determine whether a claim has been stated against the nondiverse defendant under a legal theory not alleged in the state court complaint. In short, the Cavallinis cannot rely on their affidavits to state a DTPA claim against Cunningham.

b.

In any event, even if, through the affidavits, we were to consider a DTPA claim, they do not support one. The affidavits allege, essentially, that Cunningham: misrepresented that the Olsten policy provided primary coverage; suggested that the State Farm policy be cancelled effective the date of the son's birth; suggested hiring an attorney to file a bad faith claim against the Olsten Plan; represented to Adrian Cavallini that he was the agent of State Farm; and assured Adrian Cavallini that "there would be no problems" when the son was added as an insured under the policy.

"[O]ral representations ... can serve as the basis of a DTPA action." *Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex. 1985). Although a consumer need not prove reliance on a misrepresentation to recover under the DTPA, he must prove "a deceptive act or practice ... which is a producing cause of the consumer's actual damages." *Id*. The Cavallinis did not allege that they acted on

---

manager would respond in similar circumstances. *Id*. at 935-36. In support of removal, the defendants submitted Elsbury's affidavit that the responsibility for the safety, maintenance, and operation of the plant was delegated to properly trained and qualified supervisors, and that he had no personal knowledge that the reactor posed a potential hazard or risk. *Id*. at 938. Those submitted by the plaintiffs, unlike the Cavallinis', did not attempt to present new causes of action against Elsbury, but instead contradicted the factual assertions in his affidavit. *Id*. at 938-39.

the alleged misrepresentations or that the alleged misrepresentations were a producing cause of their damages. Accordingly, the affidavits do not establish any possibility of a recovery against Cunningham under the DTPA.

4.

Finally, the Cavallinis assert that the district court erred by both denying their motion to amend and failing to consider the proposed amended complaint in determining whether a claim was stated against Cunningham.[15] As quoted earlier, *see* note 8, *supra*, the district court held that it would have been futile to grant the motion, because a complaint amended post-removal cannot divest a federal court of jurisdiction. *See, e.g.*, **Pullman Co. v. Jenkins**, 305 U.S. 534, 537 (1939) ("The second amended complaint should not have been considered in determining the right to remove, which in a case like the present one [removal based on diverse defendant's claim that controversy as to it was separable from claims against nondiverse defendants] was to be determined according to the plaintiffs' pleading at the time of the petition for removal").

The rationale for determining removal jurisdiction on the basis of claims in the state court complaint as it exists at the

---

[15]    As noted, the proposed amended complaint first appears in the record as an attachment to the third motion to amend, filed on August 30, 1993, over a month after the denial of the motion re-urging the motion to remand.  As discussed, this was the first time the district court had addressed the remand motion on the merits; it had been denied in October 1992 because of the settlement possibility.

time of removal is obvious.[16]  Without such a rule, disposition of the issue would never be final, but would instead have to be revisited every time the plaintiff sought to amend the complaint to assert a new cause of action against the nondiverse defendant, all at considerable expense and delay to the parties and the state and federal courts involved.   Limiting the removal jurisdiction question to the claims in the state court complaint avoids that unacceptable result, and permits early resolution of which court has jurisdiction, so that the parties and the court can proceed with, and expeditiously conclude, the litigation.

The Cavallinis rely upon *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de*

---

[16]    It is also consistent with Congress' intent to resolve swiftly removal issues, as reflected in the removal and remand statutes, 28 U.S.C. §§ 1446-1447.  For a civil action, a notice of removal generally must be filed within 30 days after service of the complaint, but a case may not be removed on the basis of diversity jurisdiction more than one year after commencement of the action. *See* 28 U.S.C. § 1446(b).

Similarly, a remand motion based on a defect in removal procedure must be made within 30 days after removal.  28 U.S.C. § 1447(c).  *See also **In re Carter***, 618 F.2d 1093, 1098-99 (5th Cir. 1980) (policy underlying 28 U.S.C. § 1447(d) (providing generally that remand orders are unreviewable) "is the preclusion of delay in litigating the merits of a controversy that would attend appellate litigation of jurisdictional issues"), *cert. denied*, 450 U.S. 949 (1981).   It is well-known that a motion to remand for lack of subject matter jurisdiction, as is at issue here, is not subject to the same time constraints.  *See* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").   But, it is equally well-known that citizenship for purposes of diversity jurisdiction is fixed as of when the action is filed.  *See generally **Hensgens v. Deere & Co.***, 833 F.2d 1179, 1180-81 (5th Cir. 1987); ***IMFC Professional Servs. v. Latin Amer. Home Health, Inc.***, 676 F.2d 152, 157 (5th Cir. 1982).  This is consistent with the need for certainty, avoidance of delay, and finality in resolving jurisdiction.

- 17 -

*Colombia S.A.*, 988 F.2d 559 (5th Cir. 1993), *cert. denied*, ___ U.S. ___, 114 S. Ct. 685 (1994), in which our court held that information submitted after removal may be considered in examining the jurisdictional facts as of removal. *Id*. at 565. They assert that their amended complaint would have clarified any jurisdictional ambiguity in their state court complaint.

*Dow* offers no support for the Cavallinis. The *Dow* plaintiffs, Columbian fishermen, sued Dow Chemical Company and its wholly-owned subsidiary, Dow Quimica, a Columbian corporation, in Texas state court. *Id*. at 562. Pursuant to Texas law, their complaint did not plead a specific damages amount, but alleged only that "`[d]amages far exceed the minimum jurisdictional limits of this court.'" *Id*. (brackets in original). Dow Chemical removed the case, claiming that Dow Quimica had been fraudulently joined to defeat diversity jurisdiction. *Id*. At issue was whether the district court should have considered an affidavit from the plaintiffs' attorney, attached to their motion to remand, in which he stated that none of the plaintiffs had suffered a loss greater than $50,000.

Our court noted that the injuries alleged by the plaintiffs were not "facially likely to be over the jurisdictional amount", but could not say that "the claims are *necessarily* outside of the range that could confer federal jurisdiction." *Id*. at 565 (emphasis in original). Under those circumstances, it held that the affidavit could be considered in deciding whether to remand. *Id*. It recognized the well-settled principle that "a plaintiff may not defeat removal by subsequently *changing* his damage request,

because post-removal events cannot deprive a court of jurisdiction once it has attached," *id.* (emphasis in original) (citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 292 (1938)), but distinguished the situation before it, pointing out that

> in this case the affidavits clarify a petition that previously left the jurisdictional question ambiguous. Under those circumstances, the court is still examining the jurisdictional facts *as of the time* the case is removed, but the court is considering information submitted after removal.

*Id.* (emphasis in original).[17]

Unlike *Dow*, which involved clarification of a state court complaint that stated no amount in controversy, there is no need for clarification of the Cavallinis' complaint; it does not contain allegations against Cunningham that state a claim for relief under either of the two legal theories pleaded. Moreover, as noted above, *Dow* acknowledged that a plaintiff cannot defeat removal by *changing* his damage request; it authorized the consideration of information submitted after removal only in connection with an examination of the jurisdictional facts as they existed at the time of removal. The Cavallinis' proposed amended complaint does not clarify the jurisdictional facts at the time of removal; it attempts instead to amend away the basis for federal jurisdiction. *Dow* is not contrary to the general rule that removal jurisdiction should be determined on the basis of the state court complaint at the time of removal, and that a plaintiff cannot defeat removal by

---

[17]   In holding that remand should have been granted, the *Dow* court placed emphasis on "the defendants offer[ing] only a conclusory statement in their notice of removal that was not based on direct knowledge about the plaintiffs' claims". 988 F.2d at 566.

amending it.[18]  Restated, *Dow* does not stand for the proposition that, after a fraudulent joinder removal, a plaintiff may amend the complaint in order to state a claim against the nondiverse defendant, and thus divest the federal court of jurisdiction.[19]

B.

Having confirmed the district court's jurisdiction, we turn to the summary judgment that there was an enforceable settlement.  Of course, our review of a summary judgment, including the record upon

---

[18]    As discussed, *Dow* involved an affidavit, not an amended complaint.  It cited *Robinson v. Quality Ins. Co.*, 633 F. Supp. 572, 577 (S.D. Ala. 1986), for the proposition that a court may consider information submitted after removal when examining the jurisdictional facts as of removal.  *Dow*, 988 F.2d at 565.  A parenthetical describes *Robinson* as having granted a remand motion based on the plaintiff's post-removal insertion of an *ad damnum* clause into a previously indeterminate complaint.  *Id*.  The amended complaint in *Robinson* was filed after removal, but prior to the motion to remand.  *Robinson*, 633 F. Supp. at 577.  The *Robinson* court noted that the plaintiff did not obtain leave of court prior to filing the amended complaint, and expressly recognized that "action by a plaintiff subsequent to removal cannot deprive this Court of jurisdiction if the removal was proper when filed."  *Id*.  It considered the amendment only "as evidence of the actual amount in controversy, in the absence of further enlightenment from either side."  *Id*.

In addition, *Dow* noted that, if defendants wish to avoid having a case remanded after the plaintiff comes forward with an affidavit specifying his damages, other avenues are available for clarifying an ambiguous complaint.  *Dow*, 988 F.2d at 565 n.7.  By way of example, it cites a Texas procedural rule which provides that, upon special exception by the defendant, a plaintiff may be required to amend a complaint to specify the maximum amount of damages claimed.  *Id*.  Needless to say, this reference does not support the Cavallinis' assertion that a complaint amended *after* removal should be considered in determining whether removal was proper.

[19]    Because we hold that Cunningham's joinder was fraudulent, we need not consider the appellees' alternative contentions that jurisdiction was proper under 28 U.S.C. § 1331, because their third-party complaint involved ERISA claims, or that the case was removable under 28 U.S.C. § 1441(c).

- 20 -

which it is based, is *de novo*; and we view all facts, and the inferences to be drawn from them, in the light most favorable to the non-movant. *E.g.*, **LeJeune v. Shell Oil Co.**, 950 F.2d 267, 268 (5th Cir. 1992). Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

"We apply Texas law to the enforcement of settlement agreements in Texas diversity cases", **Valley Ranch Dev. Co. v. F.D.I.C.**, 960 F.2d 550, 553 (5th Cir. 1992); and it is undisputed that Texas Rule of Civil Procedure 11 controls. That Rule provides that "no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." Tex. R. Civ. P. 11. "Rule 11 is a minimum requirement for enforcement of all agreements concerning pending suits". **Kennedy v. Hyde**, 682 S.W.2d 525, 528 (Tex. 1984). It "contemplates that something *more* is required for the enforcement of such an agreement than that it be a valid contract. That something more is its reduction to writing and signature, or their substantial equivalents: dictation into the record of the agreement's substance and assent to it on the record by all parties sought to be bound." **Anderegg v. High Standard, Inc.**, 825 F.2d 77,

80-81 (5th Cir. 1987) (emphasis in original), *cert. denied*, 484 U.S. 1073 (1988).[20]

After conducting an evidentiary hearing, the district court concluded that the parties had reached an enforceable settlement, based on an extensive exchange of detailed correspondence between State Farm and the Cavallinis' counsel. It held that an offer was made by State Farm's September 24, 1992, letter to the Cavallinis' counsel;[21] that they rejected that offer and made a counteroffer by

---

[20] The Cavallinis rely on **Padilla v. LaFrance**, 875 S.W.2d 730 (Tex. App.--Houston [14th Dist.] 1994, error granted), for the propositions that contract law cannot be applied to enforce an agreement that does not comply with Rule 11; and that a party may revoke consent to a settlement agreement at any time before judgment is entered. As for the first proposition, contract law is not being used here to enforce an agreement that does not comply with Rule 11. As for the second, discussed *infra*, the Texas Supreme Court granted a writ of error in **Padilla** on September 15, 1994, including the points that consent is not necessary for enforcement of a settlement agreement, there is no requirement that the agreement be filed before consent to it is withdrawn, and that public policy supports enforcement of the agreement. *See* 37 Tex. Sup. Ct. J. 1212 (Sept. 15, 1994).

[21] By letter dated August 13, 1992, the Cavallinis' counsel responded to a settlement offer by State Farm, stating that payment of medical expenses was acceptable, requesting that the original policy be reinstated to include all persons covered under it, stating that a conversion policy would be unacceptable, and requesting payment of $110,000, plus all court costs. In a telephone conversation on September 24, State Farm and the Cavallinis' counsel reached an oral settlement agreement. State Farm's September 24 letter was written in confirmation of that telephone conversation.

In the September 24 letter, State Farm offered to pay policy benefits for the son from the date of his birth, without regard to the policy's "other insurance" provision; to retroactively reinstate the policy effective April 16, 1992, subject to an assurance that no comparable coverage existed; to not refuse renewal of the policy except in the event of overinsurance or discontinuance of all policies in that class; to not raise premiums due to claims by the Cavallinis; and to pay $110,000. Accordingly, on September 29, State Farm delivered a check for $110,000, a

an October 8 letter;[22] that State Farm accepted the counteroffer by an October 13 letter;[23] that an October 21 letter from the Cavallinis' counsel was a request for modification of that agreement,[24] to which State Farm consented by letter of the same

proposed release, and a stipulation of dismissal to the Cavallinis' counsel.

[22]    In his October 8 letter, the Cavallinis' counsel stated that he could not approve the settlement until he received from State Farm a breakdown of the amount of benefits to be paid, objected to State Farm being allowed to consider the existence of other insurance coverage, and objected to the proposed reinstatement date, demanding that it be January 1, 1992.

[23]    In its October 13 letter, State Farm itemized the benefits it intended to pay, stated that it would consider any additional medical expenses under the terms of the policy, agreed to reinstate the policy effective January 1, 1992, agreed not to refuse renewal of the policy because of other insurance, but only "in the event of discontinuation of all policies of the class in which this policy falls", and forwarded a revised proposed release.

[24]    By his October 21 letter, the Cavallinis' counsel objected to the second proposed release regarding the release of claims that the Cavallinis "may have" in the future, its characterization of the policy as a "group" policy, and its indemnity provisions, stating that they were "in violation of" or "not part of" the "*settlement agreement*". (Emphasis added.)  He also questioned why he was being asked to sign the release.

Interestingly, the release terms to which counsel objected also appeared in the first proposed release sent to him on September 29; but, he did not object to them in his October 8 letter.  This is but one of several such instances, reflected in the acerbic letters by the Cavallinis' counsel (as well as his contentions in this appeal), which we find most troubling.  They reflect uncivil conduct that must be avoided.  Sadly, such conduct is of increasing concern.  It serves no purpose worthy of the legal profession, and results in delay in dispute resolution at greatly increased costs not only to the parties, but to the public, both in delaying resolution of other litigation and in increasing the costs for running the federal courts. ***Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n***, 121 F.R.D. 284 (N.D. Tex. 1988) (en banc) (establishing standards of litigation conduct) states the problem well:

With  alarming  frequency,  we  find  that  valuable

date (both October 21 letters were transmitted electronically);[25] and that an October 23 letter from the Cavallinis' counsel was a request for further modification,[26] to which State Farm partially agreed by an October 27 letter.[27]  Moreover, it held that the

> judicial and attorney time is consumed in resolving unnecessary contention and sharp practices between lawyers.  Judges and magistrates of this court are required to devote substantial attention to refereeing abusive litigation tactics that range from benign incivility to outright obstruction.  Our system of justice can ill-afford to devote scarce resources to supervising matters that do not advance the resolution of the merits of a case; nor can justice long remain available to deserving litigants if the costs of litigation are fueled unnecessarily to the point of being prohibitive.
>
> As judges and former practitioners from varied backgrounds and levels of experience, we judicially know that litigation is conducted today in a manner far different from years past.  Whether the increased size of the bar has decreased collegiality, or the legal profession has become only a business, or experienced lawyers have ceased to teach new lawyers the standards to be observed, or because of other factors not readily categorized, we observe patterns of behavior that forebode ill for our system of justice.  We now adopt standards designed to end such conduct.

*Id.* at 286 (footnote omitted).

[25]    In its responding October 21 letter, State Farm agreed to delete the objectionable language from the release, and stated that it would accept the release without counsel's signature; it enclosed a third revised proposed release.

[26]    The Cavallinis' counsel objected, by letter of October 23, to the third proposed release, on the ground that it was a "blanket" release that would leave his clients without any recourse to pursue future claims against State Farm, and demanded that State Farm place the policy benefits of $1,000,000 in trust, to be administered by a neutral third party.

[27]    In its October 27 letter, State Farm agreed to "dispense with the Release and resolve this matter with a simple dismissal with prejudice of the lawsuit".

agreement was enforceable under Tex. R. Civ. P. 11, because it had been reduced to writing, the signed letters were on file with the court, and their authenticity was uncontested at the evidentiary hearing.[28]

As hereinafter discussed, and based upon our required *de novo* review of the record, we agree with the district court. On the other hand, the Cavallinis contend primarily that, even assuming the existence of a valid Rule 11 agreement, they revoked their consent to it prior to the entry of judgment, *see* note 20, *supra*; that State Farm's October 13 letter did not constitute an acceptance of their October 8 counteroffer; and that the summary judgment order does not reflect accurately the settlement terms.

---

[28] The Cavallinis assert that the district court erred by relying on **Borden v. Banacom Mfg. & Marketing, Inc.**, 698 F. Supp. 121 (N.D. Tex. 1988), to supposedly extend state law, asserting that no Texas case has gone as far as **Borden** to allow letters between counsel to satisfy Rule 11's "writing" requirement. But, the court cited **Borden** only for the proposition (with which the Cavallinis agree) that Texas law controls the enforceability of the settlement agreement. In any event, for applying state law, **Erie R. Co. v. Tompkins**, 304 U.S. 64 (1938), does not require that there be a Texas case directly on point; absent such case law construing Rule 11, we look to the elements of the rule. In so doing, we do not suggest any expansion of Texas law.

The Cavallinis maintain also that **Borden** is distinguishable because it held that Rule 11's signature requirement had been satisfied by the parties' open court adoption of the correspondence exchanged between them, and that such open court adoption did not take place here. The settlement agreement in **Borden** consisted of correspondence between counsel for one of the defendants and for Borden. 628 F. Supp. at 122. Other defendants, who had not signed the correspondence, sought to enforce the settlement. **Id**. The district court held that the Rule was satisfied by those defendants' adoption of the agreement in open court. **Id**. at 124. Here, the Rule was satisfied by the signatures of the Cavallinis' counsel and State Farm's representatives; open court adoption was not necessary.

1.

The Cavallinis' revocation contention confuses Texas law on consent judgments with that on enforceability of settlement agreements.  The cases relied on by the Cavallinis stand for the proposition that, "notwithstanding a valid Rule 11 agreement, consent must exist at the time an agreed judgment is rendered."  *See* **Kennedy v. Hyde**, 682 S.W.2d at 528.

> [W]hile a party can enter into a *valid and binding* settlement agreement pending disposition of the case, a trial court cannot enter into a *consent judgment* which incorporates the terms of that agreement if one of the parties thereto withdraws consent prior to entry of the judgment.  This does *not* render the settlement agreement or its enforceability invalid--only a judgment entered in the above manner.

**Stewart v. Mathes**, 528 S.W.2d 116, 118 (Tex. Civ. App.--Beaumont 1975, no writ) (emphasis in original).  *See also* **Quintero v. Jim Walter Homes, Inc.**, 654 S.W.2d 442, 444 (Tex. 1983) (reversing judgment entered on joint motion to dismiss because one of the parties had withdrawn consent, "without prejudice to the rights [of the other party] in its attempt to plead and prove an enforceable settlement agreement under the release"); **Burnaman v. Heaton**, 150 Tex. 333, 240 S.W.2d 288, 292 (1951) ("the reversal of the [consent] judgment should be without prejudice to the right of defendants to plead the [settlement] agreement in bar of plaintiff's suit").

Obviously, State Farm did not seek entry of an agreed judgment or a consent judgment; instead, it sought summary judgment on the basis that the parties had entered into an enforceable settlement

- 26 -

agreement. Although revocation of consent prior to entry of an agreed judgment has the effect of voiding the *judgment* under Texas law, it does not affect the enforceability of the underlying *settlement agreement*. *See, e.g.*, **Quintero**, 654 S.W.2d at 444.

Moreover, addressing a similar contention that a settlement agreement ceased to be binding because the defendants had withdrawn their consent before entry of judgment, our court stated that

> [w]hether such withdrawal is or is not permissible under Texas law ... is irrelevant. Unless the defendants can demonstrate that the judgment differs materially from their agreement, or that their agreement was invalid under state law at the time it was made, a federal court may hold them to their word by incorporating the terms of their agreement into a final judgment.

**White Farm Equip. Co. v. Kupcho**, 792 F.2d 526, 530 (5th Cir. 1986). Accordingly, for purposes of determining whether the Cavallinis entered into an enforceable settlement agreement, it is irrelevant that they attempted to revoke their consent prior to entry of judgment.

2.

In asserting that State Farm's October 13 letter was not an acceptance of an October 8 counteroffer, the Cavallinis note that their October 8 letter states that "State Farm issued an individual policy which must stand on its own without regard to other coverage now or in the future", but that State Farm's October 13 response "added" a provision to which they never agreed, giving it the right to refuse renewal "in the event of discontinuation of all policies of the class in which this policy falls". This contention overlooks the fact that the language in question was not a "new"

- 27 -

provision "added" to State Farm's October 13 response; the identical language appeared in its September 24 offer and in the first proposed release, delivered on September 29 for that offer. *See* note 21, *supra*. And, as discussed in notes 22 and 24, *supra*, the Cavallinis' counsel did not object in his October 8 letter to that provision, but only to the language regarding refusal of renewal based on the existence of other coverage. As is the case with the other provisions of State Farm's September 24 offer not rejected by the October 8 counteroffer (*i.e.*, payment of $110,000), this provision became part of the agreement.[29]

3.

---

[29] Another basis urged by the Cavallinis for the settlement agreement being unenforceable is that their counsel's October 8 letter stated he would not approve the settlement until he had an opportunity to review the numbers calculated by State Farm, and that he never confirmed that the amounts itemized in State Farm's October 13 response were satisfactory. This contention borders on being a misstatement of the record. As to the "numbers" involved in the settlement, counsel's October 8 letter does not include a condition that prevented State Farm's October 13 letter from constituting an acceptance; rather, it was a request for information necessary for a complete statement of the terms of the agreement. Counsel's October 8 letter states merely that,

> as to the remainder of the benefits payable, I have not received anything from State Farm regarding the amount that State Farm is going to pay. I can not and will not on a *carte blanche* basis approve a settlement when the actual numbers are not before me.

State Farm supplied the requested information by its October 13 letter. The Cavallinis' counsel never expressed any objection to the numbers provided, thus indicating that he viewed State Farm's October 13 letter as complying with that portion of his October 8 counteroffer. In short, this contention is but another of several troubling tactics by the Cavallinis' counsel. *See* note 24, *supra*.

In one respect, the Cavallinis are correct that the summary judgment order does not reflect accurately the terms of the settlement.[30]  State Farm agrees that the inclusion of language allowing it to cancel the policy in the event of overinsurance is a clerical error, and requests that the order be reformed accordingly.

III.

For the foregoing reasons, the January 20, 1994, order is modified by deleting the words "overinsurance or" in paragraph "3)" at page 8; and, pursuant to that order as modified, the judgment is

**AFFIRMED**.

----

[30]   In their reply brief, the Cavallinis assert that the "judgment relates to the reinstatement of policy number H4245741 5353, the income policy, and is thus, *void* as to the hospitalization policy, policy number H4245740 5353, which it attempts to reinstate."  We do not understand this contention.  The judgment makes no mention of the terms; it notes its order of the same date which, of course, does state them.  One of those terms is that

> State Farm will retroactively reinstate the Limited Benefit Hospital-Surgical Policy in question effective 12:01 A.M 1/1/92 for all members of the Cavallini family who were insured under the policy at the time of termination without regard to comparable other insurance.

The district court did not refer to the policy by number, but merely restated one of the terms of the settlement agreement, as established by the correspondence between State Farm and the Cavallinis.  We do not understand the Cavallinis to contend that the correspondence refers to reinstatement of any policy other than the hospitalization policy.  Accordingly, there is no need for modification or reformation of this provision of the order.